# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  April 03, 2020

Mr. John G. Adam
Mr. Stuart M. Israel
Legghio & Israel
306 S. Washington, Suite 600
Royal Oak, MI 48067

Mr. Kenneth Winn Allen
Mr. Craig Scott Primis
Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Mr. William Arthur Wertheimer Jr.
Law Office
30515 Timberbrook Lane
Bingham Farms, MI 48025

Re:  Case Nos. 18-1471/18-1975/18-1976, *UAW, et al v. Honeywell Intl, Inc.*
Originating Case No. : 2:11-cv-14036

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW); THOMAS BODE, BRUCE EATON, WILLIAM BURNS, PETER ANTONELLIS, and LARRY PRESTON, for themselves and others similarly situated,

     *Plaintiffs-Appellees/Cross-Appellants*,

    *v.*

HONEYWELL INTERNATIONAL, INC.,
    *Defendant-Appellant/Cross-Appellee*.

Nos. 18-1471/1975/1976

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-14036—Denise Page Hood, Chief District Judge.

Argued: June 19, 2019

Decided and Filed: April 3, 2020

Before: GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** K. Winn Allen, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant/Cross-Appellee. John G. Adam, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees/Cross-Appellants. **ON BRIEF:** K. Winn Allen, Craig S. Primis, P.C., Matthew P. Downer, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant/Cross-Appellee. John G. Adam, Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, William Wertheimer, LAW OFFICE OF WILLIAM WERTHEIMER, Brooklyn, New York, for Appellees/Cross-Appellants.

  NALBANDIAN, J., delivered the opinion of the court in which GILMAN, J., joined, and STRANCH, J., joined in part. STRANCH, J. (pp. 19–24), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

NALBANDIAN, Circuit Judge.  For decades, Honeywell International (Honeywell) and its employees entered into collective bargaining agreements (CBAs) in which Honeywell promised to cover the full cost of its retirees' health insurance premiums.  That changed for certain retirees in 2003, when the parties negotiated a CBA obligating Honeywell to pay "not . . . less than" a specified amount beginning in 2008. This dispute largely turns on the meaning of that revision to Honeywell's commitment.  The retirees argue that: (1) the pre-2003 CBAs vested lifetime, full-premium benefits for all pre-2003 retirees, and (2) the 2003, 2007, and 2011 CBAs vested—at a minimum—lifetime, floor-level benefits for the remaining retirees. Honeywell maintains that none of the CBAs vested lifetime benefits of any kind, and the CBAs' "not . . . less than" language simply ended the company's obligation to make full-premium contributions.

In two summary judgment orders, the district court decided that: (1) none of the CBAs vested lifetime benefits; (2) the "not . . . less than" language did not end Honeywell's obligation to make full-premium contributions until each CBA's expiration date; and (3) Plaintiffs' claims that Honeywell had taken certain "windfall" advantages at the expense of retirees were moot. We agree with the district court's first conclusion, disagree with its second conclusion, and reject Plaintiffs' windfall claims on the merits.  We therefore affirm in part and reverse in part.

I.

Beginning in 1965, Honeywell and the United Auto Workers (UAW) labor union negotiated a series of CBAs in which Honeywell agreed to pay "the full [healthcare benefit] premium or subscription charge applicable to the coverages of [its] pensioner[s]" and their surviving spouses.  (R. 101-2, 1965 CBA at PageID 6469.)  Over the next four decades, each successive CBA likewise guaranteed full-premium contributions on behalf of pensioners and their surviving spouses.  Each CBA also contained a general durational clause stating that the

agreement would expire on a specified date and time, after which the parties would negotiate a new CBA.

When the 1999 CBA expired in 2003, Honeywell's negotiators met with the UAW to discuss the company's payment obligation in the next agreement. In a March 2003 presentation titled "The Cost of Benefits," Honeywell emphasized the effect of rising retiree medical costs on its bottom line and concluded that "[c]ost controls" were "required . . . to remain competitive." (R. 60-4, UAW Master Labor Negotiations at PageID 3122.) Those controls were necessary in part because Financial Accounting Standard (FAS) 106 "required publicly traded companies to 'recognize [immediately] a liability for the present value of all of their future payments for retiree health care expenditures [], rather than including these costs on the company's balance sheet on a pay-as-you-go basis.'" (Def.-Appellant Br. at 11–12 (quoting *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428–29 (6th Cir. 2010)).) The company thus proposed setting a "limit" on Honeywell's contribution for all retirees going forward. (R. 58-8, UAW – Honeywell Master Negotiations at PageID 2925.) With this limit in place, Honeywell could reduce its recognized FAS liabilities to the minimum required payment.

The UAW negotiators objected to this limit, in part because they believed the pre-2003 CBAs had vested lifetime, full-premium benefits for pre-2003 retirees. This meant that Honeywell had no right to reduce its contribution (at least with respect to those retirees). But Honeywell insisted that none of the CBAs had vested lifetime benefits. Richard Atwood, the UAW's lead negotiator, recalled that "the parties could not agree whether [the full-premium benefits were vested] or were not," and believed that "the only other place to settle that [disagreement] would be in court." (R. 181-2, Atwood Dep. at PageID 9044.) Eric Warren, one of Honeywell's negotiators, testified that he told Atwood that the pre-2003 CBAs did not vest full-premium benefits because the "UAW master contracts expired at the end of each contract and we renegotiated benefits . . . in each bargaining session." (R. 98-7, Warren Tr. at PageID 6063.)

Rather than reach a common understanding, however, the parties settled on language that left open whether the pre-2003 CBAs had vested full-premium benefits. This new language provided:

> The Company's contribution for health care coverage after 2007 for present and future retirees, their dependents, and surviving spouses covered under the UAW Honeywell Master Agreement shall not be less than (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007, whichever is greater. As stated above, this limit will be a mandatory subject of bargaining for 2007 UAW Honeywell Master Negotiations and for all future UAW Honeywell Master Negotiations. Notwithstanding such negotiations, the Company's contributions shall not be less than the greater of: (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007.
>
> The above limit on Company retiree healthcare contributions will not apply to any year prior to calendar year 2008.

(R. 168-2, 2003 Agreement Regarding Insurance at PageID 7907.) According to Atwood, the purpose of this language was to preserve some measure of vested benefits even if the UAW later failed to convince Honeywell (or, if necessary, a court) that the pre-2003 CBAs had vested full-premium benefits. But if the UAW did eventually secure those benefits, then the "shall not be less than" language would not be "applicable to [pre-2003] retirees at all" because those retirees would have vested full-premium benefits under the prior CBAs. (R. 181-2, Atwood Dep. at PageID 9050–55.)

The parties included the same language when they renegotiated the CBA in 2007, though they pushed back the implementation date to "calendar year 2012." (R. 53-10, 2007 Mem. of Settlement at PageID 2380.) When the parties met to renegotiate in 2011, the UAW restated its position that the pre-2003 retirees were "entitled to 100% company paid health insurance" because the pre-2003 CBAs had already vested full-premium benefits; but for those who retired in 2003 or after, the union conceded that "[t]he company contribution amount [would] be limited to the amounts described in the 2003 and 2007 agreements." (R. 59-9, 2011 Master Union Proposals at PageID 3048.) The parties again agreed to disagree on whether the pre-2003 CBAs had vested full-premium benefits. And they later signed a "Memorandum of Terms of Settlement" that incorporated, in relevant part, the language of the 2007 agreement. (Def.-Appellant Br. at 18; *see also* R. 26, Answer to Compl. at PageID 911.)

What's more, the 2003, 2007, and 2011 CBAs all contained general durational clauses like the pre-2003 CBAs before them. The CBAs also attached an Insurance Agreement, which governed the essential terms of the retirees' healthcare benefits. And the Insurance Agreement contained its own specific durational clause, which said that it would end on the same day and at the same time as the general durational clause of each CBA.

In anticipation of the contribution limit's effective date of January 2012, both parties filed suit. Honeywell first sued in the District of New Jersey, seeking a declaratory judgment that the contribution limit applied to all retirees, including those who retired before the 2003 CBA. The UAW filed suit in the Eastern District of Michigan, arguing that the floor-level requirement (1) did not apply to pre-2003 retirees and (2) established only a minimum payment obligation for post-2003 retirees, without modifying Honeywell's prior commitment to make full-premium contributions to all retirees.

The New Jersey lawsuit was dismissed, and the parties' claims were consolidated in the Eastern District of Michigan. Both parties later filed motions for summary judgment, after which the litigation stalled for several years. Although Honeywell at first abstained from enforcing the contribution limit while litigation was pending, the company began imposing the limit on post-2003 retirees in 2014 and on pre-2003 retirees in 2015. The 2011 CBA expired in 2016, after which the parties signed the 2017 CBA. This agreement, unlike the others, did not provide for any healthcare benefits. But Honeywell did not immediately stop making floor-level contributions.

The district court ruled on the parties' summary judgment motions in March 2018. In this order, the court determined that the pre-2003 CBAs did not vest lifetime, full-premium benefits for the pre-2003 retirees. The court reasoned that each CBA had a general durational clause and, "absent an express clause providing that retirees are entitled to vested lifetime health care benefits, CBAs do not vest retirees with lifetime health care benefits when the general durational clause is for the term of the agreement." (R. 161, Order Regarding Various Mots. at PageID 7810–11.) As for the contribution limit, the court held that the CBA's "shall not be less than" language did not end Honeywell's obligation to make full-premium contributions. The court reasoned that this language "simply memorialize[d] the parties' commitment that the

'actual 2007 amount/2003 estimate amount' be 'a mandatory subject[] of bargaining' in all future UAW Honeywell Master Negotiations." (*Id.* at PageID 7799.)  Because the parties had not agreed on the actual or estimated 2007 amount in the CBAs themselves, the court decided "that the 'full premium' provision [was] the only binding agreement between the parties with respect to" the 2003, 2007, and 2011 CBAs.  (*Id.*)  The court thus ordered Honeywell to reimburse retirees for any co-payments they made during the 2011 CBA in which the company had enforced the contribution limit.

A week after the district court issued its summary-judgment order, Honeywell sent a letter to its retirees stating that it had "no legal obligation to continue providing retiree medical coverage" of any kind and announcing its "intent to terminate the retiree medical and prescription drug coverage currently provided . . . effective July 31, 2018." (R. 168-11, Apr. 2018 Letter at PageID 7963.)  The UAW responded by filing a second motion for summary judgment. The union maintained that even if the pre-2003 CBAs had not vested lifetime, full-premium benefits, the 2003 CBA's "shall not be less than" language had at least vested lifetime, floor-level benefits. The district court denied the UAW's motion, finding "no indication, express or implied, that retirees were entitled to" vested floor-level benefits. (R. 186, Order Den. Pls.' Mot for Summ. J. at PageID 9139.)  The court explained that the CBA's "shall not be less than" language addressed only "the parties' intentions and aspirations, neither of which are sufficient to convey upon [the retirees] the benefits they claim." (*Id.*)

## II.

The district court's two summary judgment orders are the subject of this appeal. Honeywell challenges the district court's finding that the floor-level limit did not end its obligation to make full-premium contributions during the life of the 2011 CBA—the CBA where the limiting language introduced in 2003 finally went into effect.  The UAW appeals the district court's decision that the pre-2003 CBAs did not vest lifetime, full-premium benefits for pre-2003 retirees and that the 2003, 2007, and 2011 CBAs did not vest lifetime, floor-level benefits for the remaining retirees.  Finally, the UAW argues that remand is necessary because the district court improperly denied its claim that Honeywell took certain "windfall" financial advantages at the expense of retirees.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing law," and a dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In cases "where, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

### III.

### A.

Ever since the Supreme Court overturned this Circuit by issuing *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), we have looked to the general durational clause to specify the end date of each benefit provided for in a CBA.

We do so to obey *Tackett*'s command that we interpret CBAs under "ordinary principles of contract law." *Id.* at 930. This means *not* doing what we used to do under *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and its progeny. Those cases "plac[ed] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *Tackett*, 135 S. Ct. at 935. Applying ordinary contract-law principles means applying general durational clauses, which we had not done before *Tackett*. *See id.* at 936. By not applying those clauses, our *Yard-Man* cases "distort[ed] the text of the agreement and conflict[ed] with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *Id.*

*Tackett* unleashed "an earthquake in our caselaw[.]" *Zino v. Whirlpool Corp.*, 763 F. App'x 470, 471 (6th Cir. 2019). Since then, we have almost always concluded that a CBA with a general durational clause *unambiguously* does *not* vest healthcare benefits for retirees beyond the life of the agreement. *See, e.g., id.* at 472; *IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583, 593–96 (6th Cir. 2018); *Fletcher v. Honeywell Int'l, Inc.*, 892 F.3d 217, 226–28 (6th Cir. 2018);

*Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 623 (6th Cir. 2018); *Watkins v. Honeywell Int'l Inc.*, 875 F.3d 321, 326 (6th Cir. 2017); *Serafino v. City of Hamtramck*, 707 F. App'x 345, 354 (6th Cir. 2017); *Cole v. Meritor, Inc.*, 855 F.3d 695, 701–02 (6th Cir. 2017); *Gallo v. Moen Inc.*, 813 F.3d 265, 269–74 (6th Cir. 2016).

There have been only two attempted departures from this pattern: *Reese v. CNH Indus. N.V.*, 854 F.3d 877 (6th Cir. 2017), *overruled by CNH Indus. N.V. v. Reese*, 138 S. Ct. 761 (2018), and *UAW v. Kelsey-Hayes Co.*, 854 F.3d 862 (6th Cir. 2017), *overruled by Kelsey-Hayes Co. v. UAW*, 138 S. Ct. 1166 (2018). In both cases we held that the CBAs were ambiguous, causing us to consider extrinsic evidence despite the presence of a general durational clause. *See Reese*, 854 F.3d at 879; *Kelsey-Hayes*, 854 F.3d at 869. And in both cases we held that the extrinsic evidence supported the retirees' claims. *Reese*, 854 F.3d at 879; *Kelsey-Hayes*, 854 F.3d at 871.

Neither decision remained good law for long. In a per curiam opinion, the Supreme Court summarily reversed our decision in *Reese*. 138 S. Ct. at 761. And just six days later, the Court summarily vacated our decision in *Kelsey-Hayes* and remanded "for further consideration in light of" its decision in *Reese*. *Kelsey-Hayes*, 138 S. Ct. at 1167. We would later remark that "[t]he Supreme Court's reversal in *Reese* and remand in *Kelsey-Hayes* are powerful indications that general durational clauses should dictate when benefits expire, unless an alternative end date is provided." *Cooper*, 884 F.3d at 618.

And we would eventually settle on "a clear rule—a CBA's general durational clause applies to healthcare benefits unless it contains clear, affirmative language indicating the contrary." *Fletcher*, 892 F.3d at 223. "Put differently, *Fletcher* outlines a threshold requirement: either a CBA says clearly and affirmatively—that is, unambiguously—that its general durational clause doesn't control the termination of healthcare benefits, or the clause controls." *Zino*, 763 F. App'x at 472. That is not to say that a CBA requires "clear vesting language in order to vest benefits." *Id.* Vesting language, however, "differs from language disconnecting specific benefits from a general durational clause, and *Fletcher* requires the latter, not the former." *Id.*

Our post-*Tackett* caselaw offers clues about what disconnecting language looks like. That language probably includes statements saying "clearly and affirmatively that the relevant general durational clause doesn't control the termination of healthcare benefits—whether by reference to the general durational clause itself or by other language stating explicitly that healthcare benefits continue past the relevant agreement's expiration." *Id.*; *see also Fletcher*, 892 F.3d at 224. It also likely includes language that explicitly provides an alternative end date for health benefits. *See Cooper*, 884 F.3d at 617 ("[B]ecause the *Gallo* CBA did not specify an alternative end date for healthcare benefits, the CBA's general durational clause controlled.").

In any event, we know that none of the language in any of the CBAs here satisfies the *Fletcher* rule because that is what our precedents dictate. Without an unambiguous vesting clause, the general durational clause here controls under *Fletcher*.

B.

We first consider whether the pre-2003 CBAs vested lifetime benefits for Honeywell's pre-2003 retirees. Although the UAW focused on this claim for many years in the litigation below—most of which took place before the Supreme Court's decisions in *Tackett* and *Reese*—it devotes less attention to this argument on appeal. That is likely because the pre-2003 CBAs use the same language that our court and the Supreme Court have recently found inadequate to demonstrate an intent to vest lifetime benefits.

The pre-2003 CBAs stated that Honeywell would pay "the full premium or subscription charge applicable to the coverages of [its] pensioner[s]" and their surviving spouses. (*See* R. 101-2, 1965 CBA at PageID 6469.) But each CBA also contained a general durational clause stating that the agreement's terms would expire on a specified date and time. The UAW tries to overcome these durational clauses by citing each CBA's requirement that (1) Honeywell would pay healthcare benefits as long as the retirees were "receiving a monthly pension," (2) the retirees' surviving spouses would receive benefits, and (3) the retirees would receive Medicare Part B reimbursement. (Pls.-Appellees Br. at 32.)

These are all terms that we have found insufficient to disconnect retiree benefits from a CBA's durational clause. *See, e.g.*, *Fletcher*, 892 F.3d at 225–28 (finding that the CBA that tied

eligibility to pensioner status and provided benefits to surviving spouses could not overcome durational clause); *Cole*, 855 F.3d at 701; *Gallo*, 813 F.3d at 274 (reaching the same conclusion where the CBA also provided Medicare Part B coverage); *Gen. Elec.*, 745 F. App'x at 598. And the UAW offers no basis for distinguishing those cases from this one. We therefore affirm the district court's decision that the pre-2003 CBAs did not vest lifetime, full-premium benefits.

C.

We next consider whether the 2003 to 2011 CBAs vested lifetime, floor-level benefits. As noted above, those CBAs provided:

> The Company's contribution for health care coverage after 2007 for present and future retirees, their dependents, and surviving spouses covered under the UAW Honeywell Master Agreement shall not be less than (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007, whichever is greater. As stated above, this limit will be a mandatory subject of bargaining for 2007 UAW Honeywell Master Negotiations and for all future UAW Honeywell Master Negotiations. Notwithstanding such negotiations, the Company's contributions shall not be less than the greater of: (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007.

(R. 97-18, 2003 Agreement Regarding Insurance at PageID 5655).

Plaintiffs argue that this language vested them with floor-level benefits. And they make special note of the language stating that, "[n]otwithstanding [future] negotiations, [Honeywell's] contributions shall not be less than [a certain amount.]" (*See* Pls.-Appellees Br. at 19–30; *see also* Pls.-Appellees Reply Br. at 3.)

Plaintiffs' arguments fail because this language does not unambiguously disconnect Honeywell's contribution requirement from the CBA's general durational clause. Simply put, this language does not say, *clearly and affirmatively*, that the CBA's general durational clause does not control. *See Fletcher*, 892 F.3d at 223. It neither says that "by reference to the . . . clause itself," nor does it say *"explicitly* that healthcare benefits continue past the relevant agreement's expiration." *Zino*, 763 F. App'x at 472 (emphasis added). Thus, under *Fletcher*, the

general durational clause controls the termination of retiree healthcare benefits in the 2003 to 2011 CBAs.

That is doubly true here because the Insurance Agreement, which governs the specific terms of retirees' healthcare benefits, has its own specific durational clause. That clause terminated the Insurance Agreement at the same time that the general durational clause terminated the overall CBA. We have noted that a specific durational clause of this kind renders a contract unambiguous against vesting. *See Watkins*, 875 F.3d at 323–25. And we acknowledged as much even in *Reese*, 854 F.3d at 883 ("[I]f the CBA clearly stated that the general-durational clause was intended to govern healthcare benefits, the CBA would most likely be unambiguous.").

That said, we have repeatedly suggested that a specific durational clause containing a *later* end date than the end date within the general durational clause disconnects the benefits from the latter clause. *Gen. Elec.*, 745 F. App'x at 595 ("[A]bsent some strong indication within the four corners of the agreement itself—perhaps, a specific-durational clause that applied to certain provisions but not others—the contractual rights and obligations under a CBA terminate along with the CBA." (quoting *Serafino*, 707 F. App'x at 352)); *see also Gallo*, 813 F.3d at 265 ("Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'"). But the specific durational clause here does precisely the opposite: It explicitly ties the health benefits to the end date in the general durational clause.

As a result, the specific durational clause makes it twice as clear that the 2003 to 2011 CBAs did not vest lifetime, floor-level benefits. And the supremacy clause in each Insurance Agreement makes it triply clear. That clause states: "In the event of any conflict between the provisions of the [Insurance] Plan and the provisions of this Agreement, the provisions of this Agreement will supersede the provisions of the [Insurance] Plan to the extent necessary to eliminate such conflict." (R. 97-18, 2003 Agreement Regarding Insurance at PageID 5593.) Each supremacy clause made the above-excerpted limiting language in the Insurance Plan subordinate to the Insurance Agreement. So even if the floor-level limits suggest that benefits

continue past the CBA's termination, the supremacy clause in each CBA slams the door shut on that interpretation.

What, then, are we to make of the fact that the limiting language in the 2003 to 2011 CBAs contemplated that benefits would continue after the CBAs expired? Similarly, what are we to make of the fact that, as least for the 2003 and 2007 CBAs, the limits weren't even supposed to take effect until *after* the contracts expired?

The answer, according to our caselaw, is not much. As we discuss below, the purpose of this provision was to limit or cap Honeywell's contribution going forward. In doing so, the language evidenced the parties' expectation or hope that the benefits would continue. *See Gallo*, 813 F.3d at 269 (remarking that, for employers, "hope springs eternal" over amenable business conditions and stable healthcare costs); *see also Cole*, 855 F.3d at 701. But the language did not *guarantee* that the benefits would continue past the CBA's expiration date. To hold otherwise would be to conflate "*Honeywell'*s exposure in the event healthcare benefits continue to be provided" with "the scope of *retirees'* rights." *Cooper*, 884 F.3d at 623.

Time and time again, we have "rejected . . . reliance on contribution cap clauses to indicate vesting." *Gen. Elec.*, 745 F. App'x at 597. In *Cole*, we said that the caps meant the parties "contemplated that retiree healthcare benefits would continue." 855 F.3d at 701. But we also noted that "the continuation of retiree healthcare would have been consistent with every CBA renewal since 1968." *Id.* It made sense then that "[b]oth parties . . . anticipated that these caps would come into play based on this history of renewal." *Id.* "But the fact that they anticipated, or even hoped, that these benefits would continue [did] not mean that [the company was] bound to provide these benefits for the life of the retirees." *Id.*

The same was true in *Watkins*, where we acknowledged that Honeywell had "a good reason . . . to adopt healthcare caps, even if caps take effect only far in the future[.]" 875 F.3d at 327. That is "because companies must recognize as a liability on their balance sheet the present value of their anticipated future healthcare costs[.]" *Id.* And "caps keep companies from needing to recognize millions (or more) in future potential liability." *Id.* (citing *Wood*, 607 F.3d at 428–29).

We made the same point in *Cooper* (where Honeywell was the defendant).  *See* 884 F.3d at 623.  We explained that "the future-effect nature of the caps is an unsurprising product of collective bargaining."  *Id.*  "That the caps" take effect in the future "might well mean that Honeywell could only secure a contribution cap by offering to delay its implementation."  *Id.* "To nevertheless infer an intent to vest from the cap's future effect," we said, "is possible only by invoking *Yard-Man*'s illicit inferences[.]"  *Id.*

Although the caps here function as a floor as well, that is immaterial to the analysis. The point is that caps and floors deal with *how much* the company owes "in the event healthcare benefits continue to be provided[.]"  *Id.*  They do not speak to *whether* those benefits vested. *See id.*; *Zino*, 763 F. App'x at 472.  No matter if the parties agree to caps or floors, the inquiry remains whether the CBA shows an "unambiguous[]" intent for benefits to vest.  *Cooper*, 884 F.3d at 619.  That's because an analysis that reads vesting into the CBA wrongly places a "thumb on the scale in favor of vested retiree benefits[.]"  *Tackett*, 135 S. Ct. at 935.  In short, an agreement on the minimum, and not the maximum, a company could pay beneficiaries *should* benefits vest does not grant retirees an automatically vesting benefit.  Concluding otherwise ignores the lessons of *Yard-Man* and *Tackett*.

Most, if not all, of the reasons we recognize for not inferring an intent to vest based on future caps apply to this case.  "For decades, Honeywell and the UAW repeatedly signed CBAs that required Honeywell to pay . . . for retiree healthcare benefits during the term of each successive contract."  (Def.-Appellant Br. at 2.)  So "[b]oth parties understandably anticipated that these caps would come into play based on this history of renewal."  *Cole*, 855 F.3d at 701. And, as in *Watkins* and *Cooper*, the impetus for imposing these caps was accounting-related. The caps would help Honeywell manage the effect of Financial Accounting Standard 106.  That standard requires companies to "recognize [immediately] a liability for the present value of all of their future payments for retiree health care expenditures [], rather than including these costs on the company's balance sheet on a pay-as-you-go basis."  (*Id.* at 11–12 (quoting *Wood*, 607 F.3d at 428–29).)  The record also strongly suggests that "Honeywell could only secure a contribution cap by offering to delay its implementation."  *Cooper*, 884 F.3d at 623.  (*See* R. 58-7, 2003 Mem. Terms of Settlement at PageID 2906.)

In sum, the cap language addressed in our precedents is "legally indistinguishable" from the limiting language we confront in "the present case." *Kelsey-Hayes*, 854 F.3d at 874 (Gilman, J., dissenting). So we can conclude that such provisions "do not overcome the clear statement" against vesting supplied by the general durational clauses in the CBAs here. *Watkins*, 875 F.3d at 327. And that is even more true when, as here, specific durational clauses and supremacy clauses fortify those general durational clauses. Thus, "even if we found in the caps [here, limits] some oblique evidence of an intent to vest benefits, that would not be enough to overcome the overwhelming indications to the contrary." *Cooper*, 884 F.3d at 623.

We therefore affirm the district court's judgment that the limiting language in the 2003 to 2011 CBAs did not vest retirees with lifetime, floor-level benefits.

## D.

We next address the trial court's more limited determination that Honeywell had to pay the full cost of retiree healthcare under the 2011 CBA during its term. This issue centers on the Agreement's "shall not be less than" language and whether the floor-level requirement's effective date of January 2012 ended Honeywell's obligation to make full-premium contributions. Of course, the CBA's stipulation that Honeywell's contribution "shall not be less than" this level alone did not set a maximum contribution amount. To hold otherwise would require us to conclude that "less" means "more." But Honeywell does not ask us to make this illogical leap. The company instead claims that language in the CBAs makes clear that the floor-level requirement also set a "cap" on its payment obligation.

The district court decided that the floor-level requirement "simply memorialize[d] the parties' commitment that the 'actual 2007 amount/2003 estimate amount' be 'a mandatory subject[] of bargaining' in all future UAW Honeywell Master Negotiations." (R. 161, Order Regarding Various Mots. at PageID 7799.) Because the parties did not identify the actual or estimated 2007 amount in the 2003, 2007, or 2011 CBAs, the court held "that the 'full premium' provision [was] the only binding agreement between the parties with respect to" those agreements. (*Id.*)

Recall that Honeywell did not begin enforcing this floor-level limit until 2014. The parties delayed the requirement's effective date until January 2012—after the 2003 and 2007 CBAs had expired—so Honeywell continued to make full-premium contributions during those CBAs' terms. (*See, e.g.*, R. 168-2, 2003 Agreement Regarding Insurance at PageID 7907.) Because Honeywell made full-premium contributions during the 2003 and 2007 CBAs, the only relevant question is whether the 2011 CBA ended Honeywell's obligation to make full-premium contributions. And by the time the parties agreed to that CBA, it would have been impossible to "negotiate" Honeywell's actual 2007 contribution, which had been made, or the 2003 actuary's estimate, which had been calculated. At least neither party disputes as much. We therefore disagree with the district court's conclusion that the floor-level requirement only "memorialize[d] the parties' commitment" to negotiate the floor-level amount. (R. 161, Order Regarding Various Mots. at PageID 7799.)

Given that these limits had a discernable meaning, the question becomes: Did they (as common sense would dictate) alter Honeywell's obligations to make healthcare contributions when they began to go into effect during the 2011 CBA? Or, despite their limiting language, did they require Honeywell to keep making full-premium contributions as it had been obligated to do under the pre-2003 CBAs? Here, as often happens, the text tells us what we need to know.

The plain language of each CBA shows that the provision aimed to limit Honeywell's contribution going forward. The agreement itself calls the floor-level requirement a "limit" three times: first by referring to the "limit described below on Company retiree health care contributions," then by adding that "this limit will be a mandatory subject of bargaining[,]" and then by stipulating that "[t]he above limit . . . will not apply to any year prior to" a specified date. (*See* R. 53-10, 2007 Mem. Settlement at PageID 2380.) The district court dismissed these terms because "the common meaning of 'limit' is 'a restriction on the size or amount of something permissible or possible,'" which "does not necessarily suggest a maximum any more than a minimum." (R. 161, Order Regarding Various Mots. at PageID 7800 (quoting *Limit*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/limit (last visited

March 26, 2018)).)[1]  But another common definition of "limit" is "the utmost extent."  *Id.*  And in the context of this agreement, that definition makes more sense. If, as the district court found, the 2011 CBA unambiguously required Honeywell to make full-premium contributions up to the agreement's 2016 expiration date, then the floor-level requirement—which stated that Honeywell's payment "shall not be less than" a specified amount starting in 2012—would be a pointless obligation.  No matter what this minimum "limit" imposed, Honeywell would still have to make full-premium contributions throughout the CBA's term. Construing this "limit" as a "minimum" obligation would therefore render the floor-level requirement meaningless.  *See Gallo*, 813 F.3d at 270 (noting that a CBA "should be read to give effect to all its provisions and to render them consistent with each other").

We hold, therefore, that this language unambiguously limited Honeywell's obligation to pay only the floor-level contributions during the life of the 2011 CBA. And we reverse the district court's contrary judgment.

## E.

Finally, the UAW argues that remand is necessary to address alleged "windfall" financial advantages taken by Honeywell at the expense of retirees.  The union first argues that the Medicare subsidies paid annually to Honeywell in exchange for providing retiree prescription drug coverage should have been passed on directly to retirees in the form of reduced co-premiums.  (*See* Pls.-Appellees Reply Br. at 14.)  But the union cites no authority for the claim that Honeywell needed to do so.  The relevant statute provides for "payment to the sponsor of a qualified retiree prescription drug plan[,]" 42 U.S.C.A. § 1395w-132(a)(1), and the corresponding regulation says only that "the sponsor" of such a plan will "receive[] a subsidy payment in the amount of 28 percent of the allowable retiree costs[.]"  42 C.F.R. § 423.886(a)(1). Neither provision states that the sponsor must pass those subsidies on by reducing co-premiums. Nor do any of the CBAs mention these Medicare subsidies or require that Honeywell apply

---

[1]The dictionary cited by the district court appears to have been updated in the last year—it now defines "limit" as, among other things, "something that bounds, restrains, or confines."  *Limit*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/limit (last visited March 27, 2020).

government subsidies directly to retirees' co-premiums.  Without a basis for obligating Honeywell to give these funds to retirees, the UAW's argument fails.

The UAW next claims that Honeywell "unilaterally cancelled floor-level healthcare for retirees" who could not afford the insurance plan's co-premiums, which "created a massive 'windfall' for Honeywell" because it no longer had to make the floor-level payment to those retirees.  (Pls.-Appellees Br. at 42; Pls.-Appellees Reply Br. at 14–16.)  In the first place, it is not clear that Honeywell "unilaterally cancelled" any retirees' insurance, and the UAW cites no evidence to support this claim.  Of course, if the retirees could not afford the plan's co-premiums after Honeywell began making floor-level payments in 2014, they could not enroll in the plan.  The union's argument appears to be that, by imposing a co-payment obligation that some retirees could not afford—and thus forcing those retirees to enroll in a different insurance plan— Honeywell effectively cancelled their insurance.  But the only alternative to imposing that co-payment obligation, at least for the company-sponsored plan, would have been to contribute above the floor-level limit.  And for the reasons already explained, the 2011 CBA ended Honeywell's commitment to make payments above that limit.

The UAW points out that Honeywell also could have met its floor-level obligation through alternative arrangements that did not require retirees to enroll in the company-sponsored plan.  The union suggests, for example, that Honeywell could have entered into "Health Reimbursement Arrangements" where the company paid retirees a lump sum that they could use to pay for private insurance.  (Pls.-Appellees Reply Br. at 15–16 (quoting 26 U.S.C. § 213(d)).)  Even if true, the UAW once again cites no legal authority for the claim that Honeywell needed to create this arrangement.  The CBAs do not obligate Honeywell to make floor-level payments directly to all retirees, no matter if they choose to enroll in a company-sponsored plan.  Each CBA makes clear that these contributions apply only to retirees who choose coverage under the company-sponsored plan in place at the time or one negotiated by the parties in the future.  Without a basis for requiring Honeywell to make contributions to retirees enrolled in other plans, this argument also fails.

IV.

For these reasons, we AFFIRM the district court's decision that (1) the pre-2003 CBAs did not vest lifetime, full-premium benefits, and (2) the 2003, 2007, and 2011 CBAs did not vest lifetime, floor-level benefits.  We also AFFIRM its dismissal of the UAW's claim that Honeywell received windfall financial advantages.  And we REVERSE its decision that the 2011 CBA did not end Honeywell's obligation to make full-premium contributions during the terms of that CBA.  Finally, we REMAND this case to the district court for any further proceedings that might be needed to effectuate our opinion.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part.  I concur with most of the majority's opinion, but I respectfully dissent from its conclusion that Honeywell never guaranteed lifetime, floor-level benefits to retirees covered under the 2003, 2007, and 2011 CBAs.  Of course, relieving Honeywell of the commitment it made to these retirees—many of whom dedicated their working lives to the company—is unfair.  But that unfairness has now become a part of our governing law.  I do not fully join today's decision, however, because I believe its floor-level benefits determination violates the Supreme Court's express instruction that we apply "ordinary principles of contract law" to the interpretation of CBAs. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 930 (2015).

### A. *Yard-Man*, *Tackett*, and *Reese*

Some background is helpful.  For years we applied a series of inferences, first adopted in *UAW v. Yard-Man, Inc.*, to decide whether a CBA had vested lifetime healthcare benefits.  *See* 716 F.2d 1476, 1479–83 (6th Cir. 1983).  In *Tackett*, the Supreme Court found that "those inferences conflict with ordinary principles of contract law."  135 S. Ct. at 933.  The Court thus dismantled *Yard-Man* and reminded this circuit to use "ordinary contract principles" to "ascertain the intentions of *the parties*."  *Id.* at 935 (quoting 11 R. Lord, Williston on Contracts § 30:2, p. 18 (4th ed. 2012)).  For a few years, we assumed that *Yard-Man*'s inferences were still relevant to whether a CBA was ambiguous, even if they were not relevant to the ultimate question of whether the benefits had vested.  *See Reese v. CNH Indus. N.V.*, 854 F.3d 877, 882 (6th Cir. 2017).  But the Supreme Court disagreed once more—this time, it clarified that *Tackett* barred the use of those inferences for *any* purpose because they were "inconsistent with ordinary principles of contract law."  *CNH Industrial v. Reese*, 138 S. Ct. 761, 763 (2018) (quoting *Tackett*, 135 S. Ct. at 937).  The Court then issued a renewed instruction to "comply with *Tackett*'s direction to apply ordinary contract principles" to the interpretation of CBAs.  *Reese*, 138 S. Ct. at 765.

In our eagerness to run far away from the *Yard-Man* inferences that twice rankled the Supreme Court, we have forgotten what *Tackett* and *Reese* actually said. The Court did not instruct our circuit to canvass CBAs in search of reasons to deny healthcare benefits to retirees, however divorced those reasons might be from ordinary principles of contract law. The Court's direction was much narrower: in interpreting CBAs, we must apply the *very same* principles of contract law that we use in the typical case, "at least when those principles are not inconsistent with federal labor policy." *Tackett*, 135 S. Ct. at 933; *see also Reese*, 138 S. Ct. at 764.

That, and only that, is what *Tackett* and *Reese* instructed. The "earthquake in our caselaw," *Zino v. Whirlpool Corp.*, 763 F. App'x 470, 471 (6th Cir. 2019), did not leave a crater in its wake. The foundations of contract law remain. And we cannot secure those foundations unless we "comply with *Tackett*'s direction to apply ordinary contract principles" to the interpretation of CBAs. *Reese*, 138 S. Ct. at 765.

Our recent caselaw has struggled with this lesson and, in my estimation, it has stretched ordinary principles of contract law beyond the breaking point. Take *Fletcher v. Honeywell International, Inc.*, 892 F.3d 217 (6th Cir. 2018). There we declared that "a CBA's general durational clause applies to healthcare benefits unless it contains clear, affirmative language indicating the contrary." *Id.* at 223. Where do *Tackett* and *Reese* direct us to presume that benefits are *not* vested absent a "clear, affirmative" statement of vesting? Nowhere. In fact, *Reese* says just the opposite: in keeping with ordinary contract principles, the Court tells us to consider all "explicit terms, implied terms, or industry practice" to determine a CBA's meaning; and if those terms are "reasonably susceptible to at least two reasonable but conflicting meanings," then we must "consult extrinsic evidence" before reaching a conclusion. 138 S. Ct. at 765.

Mindful of this mismatch between *Fletcher* and *Reese*, we have tried to rescue *Fletcher* by interpreting it narrowly. In *Zino*, for example, we held that *Fletcher*'s clear-statement rule applies only to the application of a CBA's general durational clause. *See* 763 F. App'x at 472. But "[i]f a CBA *does* unambiguously disconnect certain benefits from the agreement's general durational clause, the agreement might well vest those benefits—even absent clear vesting language." *Id.* That qualification perhaps brings us within earshot of ordinary principles of

contract law. I assume in this dissent that we are bound by *Fletcher*'s clear-statement rule, subject to *Zino*'s clarification. But even accepting that *Fletcher* is somehow consistent with *Reese*, this court must still apply ordinary contract principles to decide whether the parties included "clear, affirmative language" disconnecting Honeywell's guaranteed contribution from the CBA's durational clause. *Reese*, 138 S. Ct. at 765; *Fletcher*, 892 F.3d at 223. I turn to that task.

## B. The Plain Language of the CBA

The 2003 CBA was the first to include Honeywell's floor-level payment obligation. That agreement made the following commitment:

> The Company's contribution for health care coverage *after 2007* for *present and future retirees*, their dependents, and surviving spouses covered under the UAW Honeywell Master Agreement shall not be less than (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007, whichever is greater. As stated above, this limit will be a mandatory subject of bargaining for 2007 UAW Honeywell Master Negotiations *and for all future UAW Honeywell Master Negotiations*. *Notwithstanding such negotiations, the Company's contributions shall not be less than* the greater of: (A) the actual amount of the Company's retiree health care contribution in 2007 or (B) the Company actuary's 2003 estimate of the Company's retiree health care contribution in 2007.
>
> The above limit on Company retiree healthcare contributions *will not apply to any year prior to calendar year 2008.*

(emphases added). Ordinary principles of interpretation teach that the term "shall" creates a command, not a mere suggestion or aspiration. *See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *United States v. Ostrander*, 411 F.3d 684, 688 (6th Cir. 2005) ("[The] assertion that 'shall' does not create a mandatory command simply flies in the face of standard interpretation.").

This contract language is different from language in our prior cases in several important respects. First, the parties agreed that this command would remain in effect "*notwithstanding*" "*all future negotiations*." In *Gallo*, we determined the CBA's suggestion that payments "shall

continue" did not vest lifetime benefits because the agreement stated only "that healthcare benefits 'shall continue . . . *as indicated under the* [specific CBA at issue],'" and thus the benefits incorporated that CBA's durational clause. *Gallo v. Moen, Inc.*, 813 F.3d 265, 273 (6th Cir. 2016). That incorporating language is not found in this CBA. The plain language here supports only one reasonable interpretation: the parties agreed that Honeywell's floor-level payment could "not be less than" its actual or estimated 2007 contribution going forward, regardless of whether the company tried to back away from that commitment in any "future negotiations."

Just as notable is the fact that the floor-level obligation did not even take effect until January 1, 2008—almost eight months *after* the general durational clause's expiration date of May 3, 2007. To make the general durational clause apply to these contributions, the majority must conclude that Honeywell's negotiated commitment, notwithstanding any future negotiations, expired before it even began. That does not sound like an ordinary principle of contract law. *See Gallo*, 813 F.3d at 270 (explaining that a contract's terms must be read "to render them consistent with each other") (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). The majority relies on a series of cases involving "caps" placed on an employer's hypothetical future contributions. In *Cole v. Meritor, Inc.*, for example, we found that a CBA's "hypothetical example[s]" of maximum coverage—which "show[ed] how [these] caps would apply to a worker retiring" on some future date—demonstrated only that the parties "anticipated, or even hoped, that these benefits would continue." 855 F.3d 695, 701 (6th Cir. 2017); *see also Watkins v. Honeywell Int'l Inc.*, 875 F.3d 321, 327 (6th Cir. 2017) ("[T]hat the caps contemplated healthcare benefits into the future did not mean that Honeywell had promised to provide benefits forever."); *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 623 (6th Cir. 2018) (finding "the future-effect nature of the caps [was] an unsurprising product of collective bargaining" but it was "unclear that the parties intended the cap to apply beyond the [then]-negotiated CBA").

Reliance on these cases misses the point. In each case, the "cap" at issue required only that the company's payment could not be *more* than a specified amount going forward. That was a one-sided limitation that benefited only the company—it could still meet its obligation by

making any contribution ranging from zero dollars to the maximum benefit.  We have thus held that these "[c]ontribution caps function[ed] only as limiting provisions protecting *Honeywell's* exposure in the event healthcare benefits continue[d] to be provided," but "they d[id] not speak to the scope of *retirees'* rights." *Id.*

The language enacting the benefit promised here *does* speak to the retirees' rights and it is not "immaterial" that the negotiated language sets a benefit floor.  Such commitment is precisely the opposite of that addressed in *Cole*, *Watkins*, and *Cooper*—rather than stipulate that Honeywell's payment and accounting obligations could not be *more* than a specified amount, the 2003 CBA requires that Honeywell's ongoing contribution "shall not be *less* than" a hard-dollar amount.   This agreed-upon commitment begins not with Honeywell's right to make a contribution from zero up to a capped amount, but with the requirement that Honeywell make the actual or estimated 2007 payment.  Nor is it "unclear . . . [whether] the parties intended the cap to apply beyond the [2003]-negotiated CBA," *id.*—the agreement states unequivocally that the floor-level payment must continue "notwithstanding" "all future" negotiations.  As Honeywell itself admitted in its briefing, this language created a reciprocal benefit for Honeywell *and* its retirees by "serv[ing] as both a maximum and a minimum on benefits: Honeywell could not pay less than its 2007 costs, but it also was not obligated to pay more than that."  The majority ignores the parties' negotiated choice of the term "less," not the term "more" of *Cole*, *Watkins*, and *Cooper*.  But a "cardinal principle of contract construction [is] that a document should be read to give effect to all its provisions." *Mastrobuono*, 514 U.S. at 63.  By giving the term "less" its *opposite* meaning, today's decision violates that clear principle.  *See DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 469 (2015) (noting that "[a]bsent any indication" to the contrary, a contract term "presumably takes its ordinary meaning").

Straying from the plain language of the agreement, the majority also speculates that Honeywell agreed to the floor-level commitment purely for its own benefit, to limit its accounting liabilities in the future.  Notably absent from this speculation, however, is the fact that Honeywell did not propose this language at all.  It was Richard Atwood, *UAW's* negotiator, who inserted the "shall not be less than" condition.  In his deposition, Atwood explained that UAW objected to the placement of any limit on Honeywell's future payment obligation; but to

ensure that retirees still received some vested benefit in exchange for this limit, he inserted the floor-level requirement as "a minimal limit that was to be guaranteed [and] that was to be vested for" covered retirees. Even if we were to consider extrinsic evidence—which we need not do because the language is clear—the record leaves no doubt that the purpose of this condition was to vest the floor-level contribution.

*Yard-Man* was reversed as "incompatible with ordinary principles of contract law." *Tackett*, 135 S. Ct. at 930. The majority's decision on floor-level benefits suffers from the same malady. I therefore respectfully dissent as to that holding.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 18-1471/1975/1976

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW); THOMAS BODE,
BRUCE EATON, WILLIAM BURNS, PETER
ANTONELLIS, and LARRY PRESTON,
  for themselves and others similarly situated,

       Plaintiffs - Appellees/Cross - Appellants,

      v.

HONEYWELL INTERNATIONAL, INC.,

      Defendant - Appellant/Cross - Appellee.

> **FILED**
> Apr 03, 2020
> DEBORAH S. HUNT, Clerk

Before:  GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that district court's decision that (1) the pre-2003 CBAs did not vest lifetime, full-premium benefits, and (2) the 2003, 2007, and 2011 CBAs did not vest lifetime, floor-level benefits, and its dismissal of the UAW's claim that Honeywell received windfall financial advantages are AFFIRMED.  IT IS FURTHER ORDERED that its decision that the 2011 CBA did not end Honeywell's obligation to make full-premium contributions during the terms of that CBA is REVERSED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk